Case number 19-3264, Glenda Jacqueline Prado v. Jeffrey Thomas and others. Arguments not to exceed 15 minutes per side. Mr. Katchmer for the appellant. Good morning, Your Honors. I'm George Katchmer. I represent Rhonda Prado, the appellant. I would reserve five minutes. Very well. Your Honors, this is a review of the motion for summary judgment. It's a de novo review. I will follow basically the questions that I asked according to my brief, or at least three of them, perhaps four. Mr. Katchmer, that sort of embodies our difficulty here, I think. Yes. Talking about three, perhaps four, you could probably complain about six or eight different actions of the police in this case. Could you tell us what's your strongest claim, or maybe the strongest two? I think the strongest claim, Your Honor, is the equal protection claim. And I believe the failure to train the supervised clients. All right. Just saying equal protection means a lot of things to a lot of people. Where was your client's equal protection rights violated by the police? One or two specific things that violate equal protection. Okay. First of all, Your Honor, I believe she was targeted prior to the arrest due to her ethnic group. I base this on testimony, and I've given citations to the record in my brief. The fact that she was in the Circle K convenience store. She has a Spanish accent. She was speaking. She has Hispanic features. There was another gentleman in the same line with her, purchasing whatever he was purchasing. For some reason, she was followed out of the store. Now, there's no indication. Do you know when the man left the store? I believe it was in the transfer counter. I don't think he left about the same time she did. It was in the transcript. She doesn't know when he left. Your Honor, I... Well, let's assume that you actually have evidence they left at the same time. So your complaint is that the police officer followed her and not him. So, Your Honor, let me say this. Is that your complaint? Yes, it is. Did he use his turn signal to back out of a parking space in front of a convenience store? Your Honor, we're not there yet. My question is there. I get to ask the question. Well, I understand that, Your Honor, and I have no idea. So, if he didn't engage in the same activities in the parking lot, then what is the factual basis for saying that her being followed was based on her ethnicity as opposed to what the police officer observed she did? All right. Now, the problem here, and this is the problem I think the District Court had, when I say follow, I mean follow physically out of the store, not from the parking lot, Your Honor, from the store. In the store, there's no indication that either person did anything, anything that would draw the attention of the police. Do you have a case that even remotely says that the fact that the police happened to walk out of a store at the same time the person they ultimately stopped did indicates a violation of the Equal Protection Law? Of course not, Your Honor. However, we have a situation here where we have a total. This is not in a vacuum. We have a continuing series of events that go on. To bring it like that is artificial, Your Honor, in all due respect. She's followed out of the store. To bring it like that is exactly what our case law says that we do. We second that. Well, and it also says that you view the totality of the circumstances. So that's what I'm asking this Court to do. Follows her out of the store. There's no indication of anything. In fact, he never even mentions the store. Do you have any evidence of anything else that occurred to the white gentleman you were referencing in this case? Other than the fact that he walked out of the store. Of course not, but that's the point. Well, if your argument is that we look at the totality of the circumstances, how can we do that if we don't know what the circumstances were for the white gentleman after he left the store? Your Honor, in all due respect again, I think that's irrelevant. The question is why did he follow this person out of the store when none of them, neither of them, apparently did anything in the store, but she's followed out of the store. But she told me a minute ago that they left at about the same time. Your Honor, I don't – I try to be confusing, but I don't understand the question there. Well, how can you say that the facts were that he followed her out of the store as opposed to exiting at about the same time they both did if he exited at the same time she did? Your Honor, I don't know when the white gentleman exited the store. I'm not going to sit here and pretend that I do. So if he did exit at the same time, does that demonstrate a violation of equal protection? Again, if they exited – again, I don't know under the circumstances of this case, and I'm not trying to queue for a boy. I just don't know under the circumstances here. I do know that he followed her out of the store, and I think in the transcript he says he was right behind me. And the cite for that I'll have to give it to you, but he does say that she was right behind me. So he followed her out. She gets in the car. Now, we're not disputing the fact that her trunk was open. That's not in dispute. But as we go forward, there is a – the NISA manual gives the parameters for making an arrest. Like I said, there's three blocks here. There's pre-arrest, there's arrest, and then there's what happened at the jail. At the arrest, we have the lady pulled over. She's asked for her documents, which she gives without any trouble. There's no indication of any problem, notification of any confusion, anything like that. These are counterindicators. Is this – this isn't moving on from equal protection? No, this is still equal protection. What was the evidence in the record about the other gentleman and what he was doing to get stopped, or what – how is he similarly situated? Your Honor, again, I'm going to – I will say the gentleman is the fact that she was targeted and followed out of the store. I'm not making any claims about what happened after the store. I've never made that. But I said she was targeted to go out of the store. But you just said we're turning towards what the officer did after he followed her. Yes, I'm moving – In connection with stopping her and whether he decided to detain her, right? That's a claim outside the store. Yes, it is. And you're saying that also violates equal protection? Your Honor, I'm saying that the treatment from inside that store at 1 o'clock until she's released at 4 a.m. is all of a piece. Okay. Let's assume that he targeted her and treated her differently than the white guy in the store just for purposes of our discussion. Yes. What we're – what I think Judge Nelvandian is also asking you is, at the time of the stop, to show that the stop violated your equal protection rights, unless I'm missing something, we have to compare that to how somebody not in her ethnic class was treated. So who is your comparator? Is it the white guy that walked out of the store at the same time or somebody else? Your Honor, the issue was whether there was evidence of racial animus. And I'm taking you – again, if you want to break this down into pieces, obviously you can do that. However, I'm asking you to look at the whole situation from the beginning of the store at around 1 o'clock until her release at 4 a.m. And you will see a pattern from the beginning. And it's not just this white guy. There's a white guy in the jail, too, where she is treated differently. Now, if the court chooses to do that and break this into pieces, that's the court's decision. However – You can express as much irritation in your voice with these questions as you want. But as to the person in the jail, how do we know that he was treated differently if we don't know when he was brought in, if he was stripped, if he was required to shower, anything that happened before she saw him sitting there in the jail? Your Honor, again, that is conflating things that are not – and I'm almost out of time here. But the point is they were both situated simply because we're both ready for imminent release. In the transcript – and I'm sorry, I don't think I have the correct transcript pages in the brief itself. But in the transcript, the plaintiff overhears that he is there for drugs, that he is being booked just like she is, and that his family is coming to pick him up. Same situation with her. She was being booked in and booked out. That's in the video. He knows that the husband is coming. That's in the transcript at three different places. And my time is up. So it's a question of, number one, he's being booked in just like she is. She hears the officer saying that. It's for drugs, just like her. And they're both to be imminently released. However, she gets the treatment and he doesn't. Thank you, Your Honor. I'm pretty much out of time. Thank you, Mr. Katchen. Good morning, Your Honor. My name is Alana Frake and I'm here on behalf of the apologies. Just to follow up on the court's questions, in this case, that's the issue. The primary issue in this case is there, when you're reviewing this motion for summary judgment, there simply isn't any evidence beyond the mere allegations in the complaint, whether it's with respect to the Equal Protection Claim, the Due Process Claim, the Civil Conspiracy Claim, or any of the sort of intricate parts within each of those. First, with respect to the Equal Protection Claim, as you pointed out, he has to do more than simply say, there was a white man here and a white man here, and therefore, there was different treatment. He has to somehow point to how they are similarly situated. There is nothing in the record whatsoever to establish that, to show that. His claim to begin with is that the police officer followed her out and didn't follow the white guy out, so that violates Equal Protection. What do you think the record shows as to what happened to the white guy in the story? Well, frankly, Your Honor, the record really doesn't show anything, in fact, with respect to that. In fact, what the record shows is that she indicates it, and again, the only deposition testimony you'll find in the record is hers, because no depositions were taken of any of the defendants or any of the persons. The plaintiff didn't take any depositions? No, Your Honor. Of Thomas or any of the others? No, Your Honor. None. And so... So the plaintiff did no discovery, the one deposition was taken by you, then, of her? Yes, Your Honor. Okay. There was written discovery exchanged, but that was it. There were, like, interrogatories, requests for admission, is that so? Yes. Document production. I believe interrogatories, but I know document production. In fact, in her deposition, Ms. Prado testified that Deputy Thomas, when she went to go leave, Deputy Thomas got up, but then when she left to go get in her car, he actually went to the counter and was talking to the clerk. She didn't testify that he followed her out there. On page, let's see, page 21 of her deposition, he said, he followed me to the counter. When I was out, he asked the attendant something, and she just did this, so my friend told me, this guy is going to follow you. And I said, I don't care, I have a license, I may what, I didn't drink, I haven't done anything. If he had targeted her, I'm curious, if he had targeted her, would that taint the entire, everything that happened, or would the chain be broken if there was independent probable cause for the arrest at that point? Your Honors, I would say that there is independent probable cause  I mean, there's really no dispute about the facts upon which he based the probable cause for the arrest. She doesn't dispute that her trunk was open, and his affidavit that was provided in support of the motion for summary judgment says that he enrolled her. Well, she was backing up from a parking spot and turned on her turn signal. I don't think that, in and of itself, would have been an issue. It just sort of raised, I think, a red flag. He noted it in his report, but the real issue of why he initially stopped her was because, one, her trunk was open, which is evident from the video, and she doesn't deny that that, in fact, was the case he was backing, and that she was driving down State Route 35, which is at 55 miles per hour, at about 35 miles per hour. And again, you can see that in the video, because the video itself, the panel of it shows his speed as he's following her, and that's always right around in the mid to upper 30s, once he catches up to her. So again, those are just indications that maybe something's amiss. But primarily, he stopped her, and he advised her of this because of the fact that her trunk was open and flapping. So would our cases on pretext and arrest apply here? The law is pretty clear, I think, that even if an officer is pulling somebody over on I-75 because it's a drug corridor and is pulling over because he or she thinks there's drugs in the car, as long as there was an adequate independent traffic reason to pull them over, even though they had another objective in mind, that stop is legal. I would agree with you there, Your Honor. I think at this point, the stop itself, at that point, was simply a stop to advise her about her trunk and to question why was she driving so slow. It was once he went to speak with her that he noticed that her eyes were bloodshot and that he then asked her to take the field sobriety tests. And it's from a result of those tests that then that gave him the probable cause for the arrest. So there was initially a basis for the stop, but then he had probable cause for arrest. His own report says that during the horizontal gaze... I'll say this... the HGM test, let's put it that way, that they take issue with the fact that they said this was done in the car, but if you watch the video, while he initially gave it to her in the car, he also, when she gets out of the car, he gives it to her again standing in the back of the car. And he indicates in his narrative that there were at least three points of indicators of impairment on that. Then he gave her the walk-and-turn test, again, part of the standard test that you give under the... But his instructions weren't exactly... I mean, she asked him a few times, like, do I need to turn to the right or to the left? And it's like he was being a little bit difficult with her and not instructing her on what the test was. And she clearly... I think, you know, English was obviously not her first language. He knew that, right? But he asked her, do you understand? And he demonstrated... But she then says, hey, am I turning to the right or the left? She says it multiple times, and he basically just says, do it like I told you, ma'am. OK, but I'm asking you a question. Which way am I... I forgot. I mean, you just told me I forgot. Why aren't you... I don't understand. I mean, some of this conduct seems a little strange. If the turn itself was the only issue he noted in the points with respect to that test, then maybe you might have issue with it. But he also says there's other indicators. If you look at the Ohio OVI handbook, it gives a list of other indicators of impairment. And those other indicators include she didn't necessarily put heel to toe. She didn't follow his instructions when he said to wait until I say to begin. But they weren't exactly sure. I mean, it seems to me, it's interesting in looking at the video, the other guys at Kessler... Kessler, yes. I mean, they talk about it. After they arrest her and put her in the car, they kind of go over what happened. He's trying to reassure her, well, yeah, it was, you know, I didn't see this, and, you know, you were right to do that. I mean, I don't know if he was the new officer or what was going on there, but it seemed a little strange to me that they were kind of doing a kind of reconvening and making sure that everything happened the way that they thought. Even if that were the case, if it looked to you as if, you know, maybe they weren't as certain as they should have been, he ultimately did indicate that he felt that that was enough. That reached the level of probable cause. And the district court agreed that between that and then, again, viewing everything as a whole, when you look at that she had bloodshot eyes, that she was driving slow... In the light most favorable to her, though, don't we have to look at it in the light most favorable to her for our purposes? We have to look at the facts in the light most favorable to her, but you can certainly view them all. Those aren't disputed facts. And so, therefore, you can still look at them all for the purposes of probable cause, and there was sufficient information and sufficient indicators of their purposes of probable cause. I'm just curious about something. Why didn't they give her shoes? Why did they make her go barefoot? That just seems, like, unreasonable. Well, I think originally he asked her to take off her shoes because she was in heels, and I think it was an attempt to make that, you know, it would be an easier... But if you're taking her back to Europe, she's under arrest, they put her in a car... He picks up her shoes and brings them to her. Well, why didn't he put them on? I mean, what? You're walking on a gravel road or whatever it is. I mean, that just seems, like, unnecessarily punitive to make her walk barefoot. I don't think... As I view the video, I don't know that there was actually any intent to be punitive,  I don't think any of that rises to the level of a constitutional violation by not necessarily having her... It may not. There's some things about it that seem odd. Did they throw the urine sample away? Did they throw it in the trash can? Was there a license? Again, all you have is her testimony, her speculation, because nothing was taken. Are there affidavits from Thomas? There is an affidavit. That say, we did throw it away, or we didn't... No. Do they dispute her... Are those facts disputed? There... The urine sample, when she refused to sign for the urine sample, it was... There is a dispute as to whether we indicated it was sealed. Deputy Thomas did dispose of the urine sample. It was later determined that, wait a minute, simply because she didn't sign that isn't a refusal. It was obtained from the trash, and it was then ultimately tested. It was determined that she wasn't under the influence, and therefore, the charges were dismissed. There's nothing to indicate that, well, maybe this was something he shouldn't have done. Maybe he didn't follow a protocol. Again, it's nothing that rises to the level of a constitutional violation, or anything that deprived her of any property or any interest, because ultimately, it was tested, and she was determined to be not under the influence, and the charges were dismissed. I want to ask you a couple of factual questions, but I think I know the answer to you, but I want to make sure. There is no evidence that any of the officers knew of of of this product, this EEOC complaint, or or any... Did any of the officers even know who she was? Is there any evidence of that? Only to the extent that she said to Deputy Thomas who she was at the scene, and you can see her say that she used to work for Children's Services, that she used to work for Grand County, but she herself testified she'd never met him before, she didn't know. Okay, but before she told him who she was, there's no indication that Deputy Thomas knew who she was? No, no, Your Honor. Okay. And then, I was also curious about this practice of posting of mugshots of people that are arrested. Does the county not take down the mugshots once if someone is arrested and they're later not prosecuted are the mugshots not taken down? The mugshots from the county's website are taken down. Again, in the realm of the internet, that doesn't mean I don't think that probably, again, that's not really technically my side, that it can't be retrieved in other ways. Okay. But the county takes them down. Okay, and I take it there's no evidence in the record of any of her subsequent actions to try to get employment were affected by her having been arrested? In fact, Your Honor, the evidence in the record is that she says nobody ever asked her about an arrest, nobody ever indicated she wasn't hired because of an arrest, she didn't disclose an arrest on any employment application. So there's absolutely no evidence even from her of that, nor is there any evidence that the arrest affected, she claims that it impeded her ability to come in and out of the country. In fact, the evidence is she traveled quite frequently in and out of the country six, seven, eight times after this occurred and she takes issue with the fact that the, I believe it was the Ecuadorian security looked through her luggage at some point and she believes that to be because of her arrest. However, this is simply speculation on her part. There's absolutely no evidence to that and nothing to indicate that it did any of that in terms of Is there any dispute that somebody tried to take the police report to that mediation and show it to the mediator? Yes, Your Honor. Our client absolutely disputes that and says that's not true. It's denied in the answer to the complaint. It's again, nobody was supposed to ask so we take Did they say what the piece of paper was that he was trying to show the mediator? Frankly, we don't believe there was any paper he was trying to show. No, nor was there I mean, she testified that he didn't The mediator didn't take it and they didn't take it so nobody really knows what was there. Is there an affidavit on that? No, Your Honor, because to be quite frank even if that were true again, there's nothing about him having any paperwork related to this woman who was an employee Now, she was an employee at the time of this but there's no evidence that she actually that he had this but that again would rise to any level or any constitutional violation It would be true though would it not Ms. Frick that following along Mr. Kratzmer's theory about when you look at the totality of what happened even though a couple of these instances might not have independently violated their constitutional rights but throwing the urine and the license in the trash and taking this piece of paper to the mediation session that at least would be evidence of this racial animus would it not if it were to be believed? No, Your Honor, I would disagree with that I don't think Why not? Because I don't think anything about Deputy Thomas mistakenly put in the urine sample in the trash can has anything to do with her race There's nothing to indicate it has anything to do with her race Nor is there any indication that even if the county administrator who doesn't oversee the Sheriff's Department that's a separate elected official he doesn't oversee that he doesn't have anything to do with that that there's nothing to say that he might not have interest in the fact that his former employee was at some point arrested but again I don't think there's anything about that that rises to the level of showing any racial animus I believe my time is up here unless there's any other questions I would just ask the court to uphold the district court's decision Thank you, Your Honor first if I seem irritated I do apologize I certainly didn't mean that I just get into the arguments a couple points one is there is a conflict concerning the paper I believe that Ms. Potter said both I'm pretty sure she said it in the transcript and she may have said it in her affidavit that she did in fact see the Sheriff's report in Mr. Holmstead's custody at the mediation here additionally talking about punitive the evidence is that Deputy Thomas threw was angry and threw the license and the urine sample into the trash now he says it was sealed his brother says it was not that's a conflict that's not something for the judge to judge that's something to secure yeah is there anything in the record that addresses what the deputies are supposed to do if they have a sample that for some reason is contaminated or not taken in accordance with the procedure no your honor I can't say that I have anything like that in the record I will say this going on the point about some of the seeming to be unduly punitive yeah yeah and I think that's the point I'm making to you why didn't he take any depositions excuse me why didn't he take any depositions he didn't have the money simple as that didn't have the money so did did interrogatories simple answer so you had interrogatories document requests correct requests for admission correct settled settled is there anything in the documents or the answers to the interrogatories that you would call our attention to that you think assist or cooperate what she says in her deposition concerning what your honor any of these well I think you will find that in some of the answers to interrogatories and specifically Mr. Major Kellers you will find that there is a phone contact he's contacted by Huddleston concerning this case specifically and then Huddleston shows up with the with the arrest record now it's a red herring to say gee they should have known how could they possibly know she was driving at that time no I mean we never said that what we said was the use the opportunistic use that was made of that police report and mediation has absolutely no relevance whatsoever just out of curiosity did that alleged use occur before the drug test came back showing that she didn't have alcohol and drugs yes your honor it came after the alcohol she was cleared for the alcohol on September 2nd I think the mediation was on September 9th I want to say and then on the 22nd of September is when the test came back completely negative and I I and I think then Thomas claims he got the report on the 1st of October although that's hard to credit because of the internet and then he sat on it for basically 7 or 8 days I also want to point something out your honor I'm sorry about the oh by the way concerning the buckshot I think it's in the transcript that was up and down several times it had been 67, 66, 68 of the transcript will show that in fact she was informed that it was because of the arrest that she was being segregated when she comes into the country and finally I think these pages now I don't have them that indicate that yeah it was 537, 544, 552 that they knew that her husband was coming to pick her up and in fact Thomas himself had said on the video that he was just going to book her in and book her out and then this whole thing it got into something else and my point was again two things one we conflate time artificially when we should be looking at the totality to show the intimacy two if we expand time unduly as in the situation where she's sitting to be released the guy's being booked too it says that in the transcript she hears that he's there for drugs same as her he's not thrown in the hole he's not put in by the way the general order and I've cited the general order concerning the misdemeanor arrest that's not something that's required again unduly punitive and I think if we look at the order in which these things happen I'm just curious about what you said last let's assume that she's sitting there she's already undergone these indignities she's waiting for us to pick her up she hears the conversation about this guy that's sitting there that you say is being booked does the record show what happened to him after she listed this conversation so do we know for example that he then underwent the same indignities that she did after she saw him sitting in the booking you know your honor that's a good point and I don't have any information on that I'll begin so if we don't know that either before she saw him or after she saw him he was subjected to the same treatment then what do you suggest we do with that information as far as your equal protection claim well your honor I again I'm not really not sure what to say about that she got put in the hole she got the full treatment as far as pictures and that contrary to policy I will say that and I will make that point to you contrary to the general order she got the full treatment which she wasn't supposed to get so if that doesn't make sense thank you Mr. Baxter for both counsel     clerk may adjourn   Baxter Thank you to both counsel it's a matter we take into consideration clerk may adjourn Thank you Mr. Baxter Thank you clerk may